E-FILED
Friday, 22 February, 2008  01:13:19 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| THE HEALTH CARE INDUSTRY ) <br> LIABILITY INSURANCE PROGRAM, ) <br> ) <br> **Plaintiff,** ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA and ) <br> the STATE OF ILLINOIS, ex rel VANESSA ) <br> ABSHER and LYNDA MITCHELL; ) <br> MOMENCE MEADOWS NURSING ) <br> CENTER, INC.; and JACOB GRAFF, ) <br> individually, ) <br> ) <br> **Defendants.** ) | **Case No. 07-CV-2005** |

### OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#34) filed by Plaintiff, Health Care Industry Liability Insurance Program (HealthCap).[1]  This court has carefully and thoroughly reviewed the arguments of the parties and the documents submitted by the parties. Following this careful review, Plaintiff's Motion for Summary Judgment (#34) is GRANTED in part and DENIED in part.

### FACTS

#### I.  UNDERLYING ACTION

On September 29, 2004, Plaintiffs, United States of America and the State of Illinois, ex rel. Vanessa Absher and Lynda Mitchell (the relators), filed a Complaint against Defendants Momence Meadows Nursing Center, Inc. (Momence) and Jacob Graff.  The case was assigned to Senior United States District Judge Harold A. Baker and given Case No. 04-2289.  In the Complaint, the relators

---

[1] On February 8, 2008, an Order (#42) was entered which referred this case to the Magistrate Judge based upon the signed consent of the parties.

stated that they were bringing a <u>qui</u> <u>tam</u> action against Defendants.[2]  The United States was allowed

numerous extensions of time to determine whether it would intervene in the case, and documents

filed in the case were filed under seal.  On May 10, 2006, the United States and the State of Illinois

filed a Notice of Election to Decline Intervention.[3]  On May 22, 2006, Judge Baker entered an Order

stating that the case would be unsealed beginning with the Second Amended Complaint.

On March 16, 2007, the relators filed their Third Amended Complaint.  They stated that they

were bringing a <u>qui</u> <u>tam</u> action to recover treble damages and penalties pursuant to the False Claims

Act, 31 U.S.C. § 3729 et seq., and the Illinois Whistleblower Reward and Protection Act, 740 Ill.

Comp. Stat. 175/1 et seq.  The Third Amended Complaint stated that Absher is a licensed practical

nurse and Mitchell is a registered nurse.  They are both former employees of Momence.  Momence

is a 140-bed skilled nursing facility that houses disabled and elderly patients.  At all relevant times,

Jacob Graff was Momence's owner and operator.  The vast majority of Momence's residents are

Medicare and Medicaid patients.  The Medicare and Medicaid programs impose minimum staffing,

quality of life and other requirements upon facilities that receive payment from these programs.  The

relators alleged that a number of residents at Momence received grossly substandard care for which

Medicare and Medicaid were billed.  They included allegations that residents of Momence suffered

---

[2]  The phrase <u>qui</u> <u>tam</u> comes from the Latin phrase "qui tam pro domino rege quam pro se ipso in hac parte sequitur" which means "who as well for the king as for himself sues in this matter."  Black's Law Dictionary (8th ed. 2004); <u>see also</u> <u>Info. Sys. & Network Corp. v. Fed. Ins. Co.</u>, 805 A.2d 1141, 1143 n.1 (Md. Ct. Spec. App. 2002).  Black's Law Dictionary defines a <u>qui</u> <u>tam</u> action as one "brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive."  Black's Law Dictionary (8th ed. 2004).

[3]  Judge Baker has noted that the United States still has an interest in the case, however.  A decision to decline intervention should not be construed as a statement about the merits of the case.  In fact, the United States retains the right to intervene at a later date upon a showing of good cause.  <u>See</u> Case No. 04-2289, Document #53, p.1 n.1.

unnecessary pain, suffering, disease and illness, and even death, because of the substandard care.

The relators alleged that employees were directed to falsify: (1) patient and medication records to reflect that care and medication had been provided, when it had not; and (2) staffing records, to show minimum staffing levels were reached. They alleged that employees were also told to "rechart" patient records to conceal events leading to the injury, illness, or death of some residents. They alleged that, in Momence's effort to conceal the true conditions existing at its facility, an employee was directed to place an "out of order" sign on the photocopier so inspectors from the Illinois Department of Public Health could not duplicate the records. The 38-page Third Amended Complaint includes shocking allegations of neglect of Momence's residents. The relators alleged that the worthless or substantially diminished services provided by Defendants to the elderly and disabled residents of Momence resulted in the submission of thousands of false claims to the federal and state-funded Medicare and Medicaid programs. The relators also alleged that Defendants falsely certified compliance with Medicare Rules and Regulations, which certifications were a condition of payment under Medicare.

The relators alleged that they complained to management about the inadequate care being provided to residents, the failure to provide medications and meals to residents, the appalling condition in which residents were found, and other incidents involving Momence employees. The relators alleged that they also complained to their supervisors that Defendants failed to comply with federal and state laws governing quality of care. The relators alleged that, in addition, they reported several incidents on the Illinois Department of Public Health's hotline. Mitchell alleged that she was subjected to continuous verbal abuse and hostility, was told to "shut her mouth," and was also told

that she could be terminated if she continued to complain. Mitchell alleged that she was terminated three days after one of the residents died. The Third Amended Complaint alleged that, when Absher learned that Mitchell was terminated, she felt she had no other reasonable choice but to resign. She alleged that Momence tried to prevent other employers from hiring her by faxing them a copy of her letter of resignation. The relators further alleged that Momence fabricated charges against both of them with the Illinois Department of Professional Regulation.

In the Third Amended Complaint, the relators asserted four claims against Defendants. Count I was brought pursuant to the False Claims Act and alleged that Defendants knowingly presented or caused to be presented thousands of false or fraudulent claims for Medicare and Medicaid reimbursement. The relators alleged that payment of these false or fraudulent claims resulted in the United States being damaged in an amount far in excess of millions of dollars, exclusive of interest. The relators sought, for the United States, treble damages, civil penalties, prejudgment interest, and costs incurred in bringing the action. For themselves, the relators sought the maximum amount allowed under the False Claims Act, reimbursement for their reasonable expenses, and an award of reasonable attorneys' fees and costs. In Count II, the relators alleged that Defendants were liable under the Illinois Whistleblower Reward and Protection Act for making false or fraudulent claims for payment as a result of which the State of Illinois was damaged in an amount far in excess of millions of dollars exclusive of interest. The relators sought, for the State of Illinois, three times its actual damages, civil penalties, prejudgment interest and the costs incurred in bringing this action. For themselves, the relators sought the maximum allowed by the statute, reimbursement for their reasonable expenses, and an award of attorneys' fees and costs.

In Count III, the relators alleged unlawful retaliation in violation of the False Claims Act.

4

They alleged that Momence's conduct, including verbal harassment, led to mental and emotional stress.  They alleged that Mitchell was unlawfully terminated and that Absher was constructively discharged due to Momence's conduct.  The relators sought front pay and two times their back pay, plus interest, compensatory damages, including damages for emotional distress, punitive damages, and reasonable attorneys' fees and costs.  In Count IV, the relators alleged retaliation in violation of the Illinois Whistleblower Reward and Protection Act.  The relators again sought front pay and two times their back pay, plus interest, compensatory damages, including damages for emotional distress, punitive damages, and reasonable attorneys' fees and costs.

This case currently remains pending before Judge Baker.

## II.  PROCEDURAL HISTORY

On January 10, 2007, HealthCap filed its Complaint (#1) against Defendants United States of America and the State of Illinois ex rel. Absher and Mitchell, Momence and Graff.[4]  The United States and the State of Illinois were subsequently dismissed as parties in this action.   On September 7, 2007, HealthCap filed its Amended Complaint for Declaratory Judgment (#27).   HealthCap alleged that it issued a commercial general liability policy of insurance to Momence.  HealthCap further alleged that no coverage is afforded under this policy for the allegations included in the lawsuit filed by the relators against Momence and Graff.  HealthCap therefore sought a declaration from this court that it has no duty to defend or indemnify Momence or Graff in the underlying lawsuit based upon the insurance policy it issued to Momence.  HealthCap attached a copy of the insurance policy and also attached a copy of the Third Amended Complaint filed in the underlying action.

---

[4]  This court's jurisdiction is based upon diversity of citizenship.

On December 6, 2007, HealthCap filed a Motion for Summary Judgment (#34). HealthCap argued that claims made pursuant to the False Claims Act in Count I of the underlying Third Amended Complaint do not fall within the coverage of the HealthCap policy. HealthCap also argued that there is no coverage under the policy for the claims in Counts II, III, and IV of the Third Amended Complaint because the employment-related practices exclusion of the policy precludes coverage for these claims. HealthCap again attached a copy of the policy at issue and the Third Amended Complaint filed in the underlying action. HealthCap argued that it is entitled to summary judgment on its declaratory judgment action seeking a declaration that it has no duty to defend or indemnify Momence or Graff in the underlying action.

On January 29, 2008, Defendants Momence and Graff filed their Response to Motion for Summary Judgment (#40) and attached exhibits. Defendants contended that, based upon the terms of the insurance policy, HealthCap has a duty to defend them against the underlying lawsuit. Defendants also argued that any determination regarding the duty to indemnify is not ripe for decision until liability, if any, under the underlying lawsuit is established. On February 4, 2008, HealthCap filed its Reply to Defendants' Response (#41) again arguing that it is entitled to summary judgment in its favor.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In

6

ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is not warranted when there are genuine issues of material fact with respect to the interpretation of a contract. Cherry v. Auburn Gear, Inc., 441 F.3d 476, 481 (7th Cir. 2006). However, the "interpretation of an unambiguous contract is a question of law, and therefore a dispute over the terms of an unambiguous contract is suited to disposition on summary judgment." Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 687 (7th Cir. 2004). Under Illinois law, the construction of an insurance policy and a determination of the rights and obligations under the policy are questions of law which are appropriate for resolution by summary judgment.[5] Crum & Forster Managers Corp. v. Resolution Trust Corp., 620 N.E.2d 1073, 1077 (Ill. 1993); Hartford Fire Ins. Co. v. Everest Indem. Ins. Co., 861 N.E.2d 306, 310 (Ill. App. Ct. 2006); see also Essex Ins. Co. v. Soy City Sock Co., 503 F. Supp. 2d 1068, 1072 (C.D. Ill. 2007).

## II.  APPLICABLE LAW

Under Illinois law, it is well settled that an "insurer's duty to defend its insured is much broader than its duty to indemnify its insured." Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co., 828 N.E.2d 1092, 1098 (Ill. 2005), citing Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, 1220 (Ill. 1992). To "determine whether an insurer has a duty to defend its insured, 'the court must look to the allegations in the underlying complaint and compare these allegations to the relevant coverage provisions of the insurance policy.'" Native Am. Arts, Inc. v. Hartford Cas. Ins. Co., 435 F.3d 729, 732 (7th Cir. 2006), quoting Crum & Forster, 620 N.E.2d

---

[5]  The parties do not dispute that Illinois law applies in this diversity action.

at 1079.  If the facts alleged in the underlying complaint fall within, or even potentially within, the coverage provisions of the policy, the insurer must defend the insured.  Valley Forge Ins. Co. v. Swiderski Elecs., Inc., 860 N.E.2d 307, 314-15 (Ill. 2006).  In assessing whether this duty exists, a court must construe the allegations in the underlying complaint liberally and any doubt in coverage must be resolved in favor of the insured.  Native Am. Arts, Inc., 435 F.3d at 732.  "Nonetheless, deference only goes so far; if the policy terms are unambiguous, the court must apply their plain and ordinary meaning."  Native Am. Arts, Inc., 435 F.3d at 732, citing Crum & Forster, 620 N.E.2d at 1078.  Therefore, an "insurer has no duty to defend where it is 'clear from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage.'"  Native Am. Arts, Inc., 435 F.3d at 734, quoting U.S. Fid. & Guar. Co. v. Wilkin Insulation Co., 578 N.E.2d 926, 930 (Ill. 1991).

"In construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the parties as expressed in the agreement."  Crum & Forster, 620 N.E.2d at 1078.  "To ascertain the intent of the parties and the meaning of the words used in the insurance policy, the court must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract."  Crum & Forster, 620 N.E.2d at 1078; see also Liberty Mut. Ins. Co. v. Am. Home Assurance Co., 858 N.E.2d 530, 536-37 (Ill. App. Ct. 2006).  If the words used in the policy are plain and unambiguous, the court will afford them their plain and ordinary meaning and will apply them as written.  Crum & Forster, 620 N.E.2d at 1078; see also Sokol & Co. v. Atl. Mut. Ins. Co., 430 F.3d 417, 420 (7th Cir. 2005).

### III.  APPLICABLE INSURANCE POLICY PROVISIONS

HealthCap issued a commercial general liability policy to Momence which was effective between March 31, 2004 to March 31, 2005, with a retroactive date of coverage to March 31, 2003. It is undisputed that some of the alleged conduct set out in the Third Amended Complaint filed in the underlying action potentially falls within the policy period.

The policy included "Coverage A" which provided coverage for bodily injury and property damage liability. The policy also included "Coverage B" which provided coverage for personal and advertising injury liability. In addition, the policy included professional liability insurance. Under Coverage A, the policy stated:

> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> . . .
>
> c.  Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."
>
> d.  Damages because of "bodily injury" includes incidental medical malpractice damages sustained because of the

administration of or failure to administer first aid.

Coverage B provides coverage for "personal and advertising injury" to which this insurance applies. The policy stated that "'[p]ersonal and advertising injury' means injury, including consequential 'bodily injury,' arising out of one or more of the following offenses: . . . ." The list of offenses included "[o]ral or written publication of material that slanders or libels a person" and "[o]ral or written publication of material that violates a person's right of privacy."

The policy included an "employment-related practices exclusion" which applied to both Coverage A and Coverage B. This exclusion stated:

> This insurance does not apply to any claim or "suit" by or on behalf of:
>
> 1. A person arising out of any:
>
>  a. Refusal to employ that person;
>
>  b. Termination of that person's employment; or
>
>  c. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at the person;
>
>    . . . .
>
> This exclusion applies:
>
> 1. Whether the insured may be liable as an employer or in any other capacity; and
>
> 2. To any obligation to share damages with or repay someone

else who must pay damages.

Under professional liability insurance coverage, the policy stated that "[w]e will pay those sums that the insured becomes legally obligated to pay as 'damages' because of 'injury' to which this insurance applies." The policy further stated:

> This insurance applies only to "injury" which occurs during the policy period. The "injury" must be caused by a "medical incident." The "medical incident" must take place in the "coverage territory." The "medical incident" must arise out of the providing or withholding of the following professional services:
>
> (1)    Medical, surgical, dental or nursing treatment to a person. This includes furnishing food or drink in connection with that treatment. It also includes "injury" to any other person injured in the furnishing of such treatment.
>
> (2)    Furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances. This applies only if you have given possession to others before the "injury" occurs.
>
> (3)    Handling or performing post-mortem examinations on human bodies.
>
> (4)    Acts of persons serving on your formal accreditation board or similar boards. This includes acts of those charged with doing what such boards direct.

The policy defined "medical incident" as "an act or omission in the furnishing of professional

11

services by an insured."

## IV.  COUNT I

As noted previously, Count I of the Third Amended Complaint in the underlying action seeks damages pursuant to the False Claims Act.  HealthCap argues that there is no coverage for False Claims Act claims under the policy because general liability coverage is not triggered unless allegations of bodily injury or property damage are made.  HealthCap contends that Count I makes no such allegations and, instead, alleges only statutory violations and seeks monetary damages for those violations.  In response, Defendants Momence and Graff contend that, in Count I, the underlying lawsuit seeks damages "because of" bodily injury to Momence's residents and falls squarely within the coverage of the policy issued to Momence.  Defendants argue that the False Claims Act claims rest on the presumption of bodily injury and that damage "because of" bodily injury need not be direct compensation for bodily injury to the injured person.  They argue that the alleged bodily injuries to the residents are the foundation of the underlying lawsuit.  They contend that, because bodily injury is involved, the duty to defend is triggered.

The elements of a claim under the False Claims Act for presenting a false claim are: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false.  United States ex rel. Fowler v. Caremark RX. L.L.C., 496 F.3d 730, 740-41 (7th Cir. 2007).  Similarly, the elements of a claim under the False Claims Act for making a false record or statement to get a false or fraudulent claim paid or approved are: (1) that the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false.  Caremark RX, 496 F.3d at 741.  What constitutes a False Claims Act offense is the knowing

presentation of a claim that is either fraudulent or simply false.  <u>United States ex rel. Hopper v. Anton</u>, 91 F.3d 1261, 1266 (9th Cir. 1996); <u>United States ex rel. Cal. Advocates for Nursing Home Reform v. Am. Int'l Specialty Lines Ins. Co.</u>, 2007 WL 4208352, at *3 (N.D. Cal. 2007); <u>Horizon West Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 214 F. Supp. 2d 1074, 1077 (E.D. Cal. 2002), <u>aff'd</u>, 45 Fed. Appx. 752 (9th Cir. 2002).[6]  "The injury suffered by the United States under the [False Claims Act] is the difference between what the government actually paid and the amount it would have paid in the absence of a fraudulent claim." <u>Cal. Advocates</u>, 2007 WL 4208352, at *3, <u>quoting</u> <u>Horizon West</u>, 214 F. Supp. 2d at 1077.  Liability under the False Claims Act is premised on presenting a false claim for payment, "not upon the underlying conduct used to establish the falsity of such a claim." <u>Cal. Advocates</u>, 2007 WL 4208352, at *3, <u>quoting</u> <u>Horizon West</u>, 214 F. Supp. 2d at 1077; <u>see also</u> <u>Hopper</u>, 91 F.3d at 1266 (Ninth Circuit explained that the False Claims Act "attaches liability, not to the underlying fraudulent activity, but to the 'claim for payment'").

Courts have therefore found that there is no insurance coverage for False Claims Act claims, even if there would have been coverage for the alleged underlying conduct. <u>See</u> <u>M/G Transp. Servs., Inc. v. Water Quality Ins. Syndicate</u>, 234 F.3d 974, 978 (6th Cir. 2000) (court found no coverage and rejected the insured's attempt to "bootstrap liability for [False Claims Act] violations into the coverage provided by the environmental pollution policies," reasoning that "[a False Claims Act] action is not converted into a Clean Water Act action simply because a violation of the Clean

---

[6]  This court notes that, on January 7, 2008, Judge McCuskey entered an Order (#37) which struck HealthCap's citation of the unpublished decision of the Ninth Circuit Court of Appeals in <u>Horizon West Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 45 Fed. Appx. 752 (9th Cir. 2002) in its Motion for Summary Judgment.  Defendants had argued that sanctions were warranted because HealthCap cited the case in violation of Seventh and Ninth Circuit Rules. Judge McCuskey declined to sanction HealthCap but did strike the citation of the unpublished Ninth Circuit decision.  This court notes that the Rules do not prohibit this court's reliance on district court decisions, both published and unpublished, as persuasive authority.

Water Act is a predicate to establishing the falsity of a claim, or may be used as a measure of damages under the [False Claims Act]"); Info. Sys. & Network Corp. v. Fed. Ins. Co., 805 A.2d 1141, 1146-47 (Md. Ct. Spec. App. 2002) (no coverage for qui tam action brought under False Claims Act based on allegations that an automated access control system installed at an airport was defective and had to be replaced and seeking damages for the costs of the forfeiture of the system, the money paid under the falsely obtained contract, delay damages and penalties because the actual claim was not for "property damage"); Hercules Inc. v. AIG Aviation, Inc., 776 A.2d 550, 559-60 (Del. Super. Ct. 2000) (no coverage for False Claims Act claims based upon delivery of substandard aerospace products because the False Claims Act litigation, "at bottom, did not involve property damage or breach of warranty," but rather "involved claims for civil penalties due to fraud against the United States").   In Horizon West, as here, the relators brought a qui tam suit, alleging that the defendant violated the False Claims Act by submitting Medicare and Medicaid claims for services that were not provided, and by falsifying records to conceal substandard conditions at the nursing homes run by the defendant.  Horizon West, 214 F. Supp. 2d at 1076.  In finding no insurance coverage, the district court concluded that the numerous allegations of substandard care did not form the basis for the False Claims Act suit.  Horizon West, 214 F. Supp. 2d at 1077.  The district court stated that these allegations were "relevant to the [False Claims Act] suit only as evidence that the Medicare and Medicaid claims seeking reimbursement for patient care were false."  Horizon West, 214 F. Supp. 2d at 1077-78.  This court agrees with the well-reasoned analysis in these cases and finds them persuasive regarding coverage for False Claims Act claims.

Defendants argue that the decision in Watts Indus., Inc. v. Zurich Am. Ins. Co., 18 Cal. Rptr. 3d 61 (Cal. Ct. App. 2004) supports finding coverage in this case.  In Watts, the underlying suit

began as a <u>qui</u> <u>tam</u> action under the state False Claims Act and involved allegations of injury to the water systems of various municipalities and lead contamination of water flowing through the systems, resulting from substandard parts sold by the defendants. <u>Watts</u>, 18 Cal. Rptr. 3d at 63-64. Numerous municipalities intervened in the action and sought damages for replacement of the substandard parts, damages for the diminished service life of the substandard parts, as well as damages related to lead contamination. <u>Watts</u>, 18 Cal. Rptr. 3d at 64. The defendants filed suit seeking insurance coverage under their commercial general liability policies which promised to defend and indemnify for damages resulting from property damage. <u>Watts</u>, 18 Cal. Rptr. 3d at 63. On appeal, the court affirmed the trial court's decision that the underlying plaintiffs' allegations of injury to their water raised a possibility of coverage sufficient to trigger a duty to defend. <u>Watts</u>, 18 Cal. Rptr. 3d at 63. In doing so, the court noted that "[i]n requesting costs for replacement of [the defective] parts and for water quality monitoring, the municipalities seek court-ordered monetary payments due to the alleged harm caused by [the defendants]." <u>Watts</u>, 18 Cal. Rptr. 3d at 68. The court concluded that insurance coverage for these damages was provided under the California Supreme Court's broad construction of the phrase "because of property damage." <u>Watts</u>, 18 Cal. Rptr. 3d at 68.

This court agrees with HealthCap that the decision in <u>Watts</u> does not support Defendants' position in this case. While <u>Watts</u> was initially brought as a <u>qui</u> <u>tam</u> action under the state False Claims Act, the intervening municipalities added claims which the court found alleged "property damage" and were covered under the insurance policies at issue. HealthCap is correct that the underlying complaint in <u>Watts</u> contained specific allegations of property damage sufficient to trigger coverage. In this case, the relators have only sought recovery under the False Claims Act in Count

I of the Third Amended Complaint.[7]   Therefore, this court agrees that the decision in <u>Watts</u> is inapposite.  This court cannot agree with Defendants that Count I of the underlying Third Amended Complaint seeks damages "because of" personal injury.  This court reaches this conclusion based upon the case law cited above regarding claims brought under the False Claims Act as well as the language of the policy explaining damages "because of" personal injury.  In Count I of the Third Amended Complaint, the relators sought damages under the False Claims Act for payments made by the United States based upon false or fraudulent claims.  The relators are not seeking damages for "care, loss of services or death resulting at any time from the 'bodily injury'" or "incidental medical malpractice damages sustained because of the administration of or failure to administer first aid."  This court therefore concludes that the relators are not seeking damages "because of 'personal injury'" as explained by the terms of the policy at issue.  Accordingly, the claims are not covered by the comprehensive general liability policy issued by HealthCap.

Defendants, however, argue that the gravamen of the allegations in the underlying lawsuit do not reflect false claims, but malpractice.  Defendants contend that the relators could have brought a malpractice action because Absher's mother was a resident of Momence for many years.  Defendants argue that HealthCap has not established that there is "no conceivable theory" which could bring the underlying complaint within the policy coverage, citing <u>Watts</u>, 18 Cal. Rptr. 3d at 66.  This court has already distinguished the decision in <u>Watts</u> and notes that Illinois law does not require an insurer to establish there is "no conceivable theory" which could bring the underlying

---

[7]  Defendants have argued that the relators have failed to adequately state a claim under the False Claims Act.  They have raised this argument in Motions for Judgment on the Pleadings currently pending in the underlying action before Judge Baker.  It is not this court's role to determine whether the Third Amended Complaint is adequate to state a cause of action.  This court's role is to determine whether, based upon the allegations made in the Third Amended Complaint, HealthCap has a duty to defend.

complaint within the policy coverage.  Under Illinois law, this court must look to the allegations in the underlying complaint, compare these allegations to the relevant coverage provisions of the insurance policy, and determine if the facts alleged in the underlying complaint fall within, or even potentially within, the coverage provisions of the policy.  See Native Am. Arts., Inc., 435 F.3d at 732, quoting Crum & Forster, 620 N.E.2d at 1079.  This court must consider the actual complaint, not some hypothetical version.  See Conn. Indem. Co. v. Der Travel Serv., Inc., 328 F.3d 347, 350-51 (7th Cir. 2003).  Count I of the underlying Third Amended Complaint only alleges violations of the False Claims Act, and does not seek any damages for the personal injuries allegedly suffered by Momence's residents.  Accordingly, this court concludes that the allegations do not fall within, or even potentially within, the coverage provisions of the policy.  See Certain Underwriters at Lloyd's, London v. Health Care Mgmt. Partners, Ltd., 2006 WL 2050962, at *9 (D. Colo. 2006) (court found no coverage, noting that, while the underlying complaint alleged that the residents of the nursing facility "sustained injuries caused by or because of their failure to receive sufficient or appropriate 'professional [nursing] services,' there [was] no claim made on behalf of the residents for such injuries").

Defendants have also argued that, based upon the professional liability insurance coverage provided in the policy, HealthCap has a duty to defend the underlying action.  Defendants argued that "[e]very alleged activity in the Underlying Lawsuit arose out of a medical incident in the performance of nursing treatments or alleged lack thereof."  The district court in Cal Advocates rejected an argument similar to the one made by Defendants.  In the Cal. Advocates case, the plaintiffs in the underlying action alleged that Lenox Healthcare, Inc. (Lenox) submitted false certifications regarding its compliance with state and federal laws and regulations in order to

17

improperly obtain continued Medi-Cal and Medicare funding and submitted false claims for services rendered.  Cal. Advocates, 2007 WL 4209352, at *1.  Lenox defaulted in the underlying actions and damages were awarded under the Federal and State False Claims Acts, including trebled damages and attorneys' fees and expenses.  Cal. Advocates, 2007 WL 4209352, at *1-2.  The plaintiffs filed an action against the insurance company to recover defense and indemnity costs and argued that there was coverage under the professional liability policy.  Cal. Advocates, 2007 WL 4208352, at *1-2.  In rejecting this argument, the district court stated that "Lenox's liability under the [False Claims Act] was premised on the presentation of false claims and records or statements to the government, not the underlying deficiencies in patient care that was used to establish the falsity of Lenox's claims and representations."  Cal. Advocates, 2007 WL 4208352, at *5.[8]  The district court therefore found that the False Claims Act action did not qualify as a "medical incident" which required the furnishing of "professional services" under the policy.  Cal. Advocates, 2007 WL 4208352, at *5.  This court finds this reasoning persuasive.[9]  Based upon the policy provisions at

---

[8]  This court notes that courts have uniformly rejected an argument that the preparation of false certifications and false billing statements involved the furnishing of professional health care services, so that claims under the False Claims Act are covered under professional liability coverage provisions.  See Cal. Advocates, 2007 WL 4208352, at *3–5; Certain Underwriters at Lloyd's, London, 2006 WL 2050962, at *9; Hampton Med. Group, P.A. v. Princeton Ins. Co., 840 A.2d 915, 921 (N.J. Super. Ct. App. Div. 2004); Horizon West, 214 F. Supp. 2d at 1078-79.  The courts reasoned that billing for services rendered is not a professional service but, rather, it is the effect of the service provided, not a part of the service itself.  See Certain Underwriters at Lloyd's, London, 2006 WL 2050962, at *9; Horizon West, 214 F. Supp. 2d at 1079; see also Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co., 142 F.3d 512, 515-16 (1st Cir. 1998); Jerome Group, Inc. v. Cincinnati Ins. Co., 257 F. Supp. 2d 1217, 1224 (E.D. Mo. 2003).

[9]  This court notes that, in Beatty v. Doctor's Co., 871 N.E.2d 138 (Ill. App. Ct. 2007), app. denied, 875 N.E.2d 1109 (Ill. 2007), the Illinois appellate court let stand an arbitrators' decision that there was potential coverage under a professional liability policy for a qui tam action brought under the False Claims Act.  This court concludes that this decision does not support Defendants' position because the court noted its limited review of the arbitrators' decision and declined to "undertake an independent analysis of the underlying complaint and insurance policy."  Beatty, 871 N.E.2d at 143.

issue in this case, this court also concludes that the claims under the False Claims Act are not allegations of a "medical incident" which is covered under the terms of the professional liability insurance coverage.

For all of the reasons stated, this court agrees with HealthCap that it has no duty to defend the claims included in Count I of the Third Amended Complaint filed in the underlying action.

## V.  COUNT II

HealthCap argued that there is no coverage for the claims in Count II under the Illinois Whistleblower Reward and Protection Act because coverage is precluded under the employment-related practices exclusion.  HealthCap notes that an action under the Illinois Act must be brought by a an "original source" which is defined as "an individual who has direct and independent knowledge of the information on which the allegations are based . . . ."  740 Ill. Comp. Stat. 175/4(e)(4)(A),(B) (West 2006).   HealthCap contends that the employment-related practices exclusion applies because the only way the relators had direct and independent knowledge was through their employment by Momence.  Defendants have argued, however, that the claims in Count I under the False Claims Act and the claims in Count II under the Illinois Act "are essentially identical" so that if there is coverage for Count I there must be coverage for Count II.   This court agrees that the claims are essentially identical.  Therefore, because there is no coverage under the HealthCap policy for the claims in Count I, there is also no coverage for the claims in Count II.  See Cal. Advocates, 2007 WL 4208352, at *2-5 (court found no coverage where claims were brought under both the Federal and State False Claims Acts).  This court accordingly agrees with HealthCap that it has no duty to defend the claims included in Count II of the Third Amended Complaint filed in the underlying action.

19

## VI.  COUNTS III AND IV

As noted previously, Count III alleges retaliation in violation of the False Claims Act and Count IV alleges retaliation in violation of the Illinois Whistleblower Reward and Protection Act. In both Counts, relators Absher and Mitchell allege that Defendants took various adverse actions against them because of their complaints regarding the inadequate care provided to Momence's residents.  HealthCap argues that there is no coverage for the retaliation claims included in Counts III and IV because coverage is precluded under the employment-related practices exclusion.

It is the burden of the insurer to show that a claim falls within a provision that limits or excludes coverage.  West Bend Mut. Ins. Co. v. Rosemont Exposition Servs., Inc., ___ N.E.2d ___, 2007 WL 4302515, at *6 (Ill. App. Ct. 2007); Pekin Ins. Co. v. L.J. Shaw & Co., 684 N.E.2d 853, 855 (Ill. App. Ct. 1997).  In addition, this court recognizes that when an insurer "seeks to avoid coverage based on an exclusionary provision in the policy, the applicability of the exclusionary clause must be clear and free from doubt."  Bituminous Cas. Corp. v. Fulkerson, 571 N.E.2d 256, 262 (Ill. App. Ct. 1991); see also West Bend, 2007 WL 4302515, at *6.  Moreover, "[p]rovisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer."  Am. Alliance Ins. Co. v. 1212 Rest. Group, L.L.C., 794 N.E.2d 892, 897 (Ill. App. Ct. 2003), citing Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Glenview Park Dist., 632 N.E.2d 1039, 1042 (Ill. 1994).  However, when a clear and unambiguous exclusion places a valid limitation on policy coverage, the plain language of the exclusion must be enforced by the courts. See Native Am. Arts, Inc., 435 F.3d at 733; Pekin Ins. Co., 684 N.E.2d at 859.

HealthCap argues that the exclusion applies because the basis for the allegations of retaliation  are the employment related practices, acts or omissions of Momence.  HealthCap relies

on Agric. Ins. Co. v. Focus Homes, Inc., 212 F.3d 407 (8th Cir. 2000), and Adams v. Pro Sources, Inc., 231 F. Supp. 2d 499 (M.D. La. 2002).  In Agric. Ins. Co., the Eighth Circuit concluded that an employment practices exclusion very similar to the one at issue in this case precluded coverage for claims brought by three women employees against their employer, including a whistle blower claim and claims of constructive discharge.  Agric. Ins. Co., 212 F.3d at 411-12.  The court stated that each of the underlying plaintiffs' claims turned on employment practices and dealt "with the insureds' treatment of the plaintiffs as employees."  Agric. Ins. Co., 212 F.3d at 411-12.  In Adams, the district court similarly concluded that an employee's defamation claim was excluded from coverage under the employment practices exclusion because, although the alleged defamatory statement was made after the employment relationship had ended, it was made in the context of employment and described the former employee's performance.  Adams, 231 F. Supp. 2d at 505-06.

In Response, Defendants argue that the underlying Third Amended Complaint in this case includes allegations which are not excluded by the employment-related practices exclusion so that HealthCap has a duty to defend.  Defendants contend that Absher has alleged "bodily injury" by virtue of the alleged mental and emotional distress she suffered due to Defendants' alleged failure to care for the residents.  Defendants argue that Absher's allegations of bodily injury are not excluded by the employment practices exclusion because she was not terminated but quit.  Defendants also argue that Absher's allegations  regarding faxing her letter of resignation to potential employers falls under Coverage B as a violation of her "right of privacy."  Defendants contend that these allegations are not excluded from coverage under the employment-related practices exclusion because Absher's letter of resignation did not relate to her job performance.  Defendants stated that the "only information in [her resignation letter] is her reason for quitting."

The Illinois Appellate Court has addressed the same type of exclusion at issue here.  In 1212 Rest. Group, the court carefully reviewed case law from other jurisdictions regarding this issue, including the decision in Adams.  1212 Rest. Group, 794 N.E.2d at 897-900.  The court then concluded that post-termination acts of defamation or other employment related practices could reasonably arise directly and proximately from the termination so that the exclusion was applicable.  1212 Rest. Group, 794 N.E.2d at 900.  The court stated that narrowly interpreting the exclusion to not include post-termination conduct is "semantically unreasonable and unacceptable."  1212 Rest. Group, 794 N.E.2d at 900, quoting Loyola Marymount Univ. v. Hartford Accident & Indem. Co., 271 Cal. Rptr. 528, 531 (Cal. Ct. App. 1990).  However, in 1212 Rest. Group, the court determined that the defamation alleged in the underlying action included personal insults separate from the plaintiff's employment so that the exclusion did not apply and the insurer had a duty to defend. 1212 Rest. Group, 794 N.E.2d at 900-01.

Subsequently, the court in West Bend considered the same exclusion.  In West Bend, the underlying complaint alleged retaliatory discharge and defamation.  The court in West Bend concluded that the trial court correctly determined that the claims were excluded under the employment-related practices exclusion and rejected the employer's argument that an allegedly defamatory letter was not employment related.  The court stated:

> while defamation directed at a person's employment performance would certainly be employment related, so too would any defamation perpetrated as an explanation or justification for terminating a person's employment regardless of its connection to employment performance.

<u>West Bend</u>, 2007 WL 4302515, at *9.

In this case, based upon the reasoning of the Illinois appellate court in <u>1212 Rest. Group</u> and <u>West Bend</u>, this court concludes that all of the allegations contained in Counts III and IV relate to employment-related practices and are therefore excluded from coverage. The alleged faxing of Absher's resignation letter clearly related to her employment with Momence, even though the letter did not include any information regarding her job performance, as Defendants acknowledge it stated "her reason for quitting." <u>See</u> <u>West Bend</u>, 2007 WL 43202515, at *9 (explanation for terminating employment considered employment related). In addition, although Absher resigned and was not fired, she has alleged constructive discharge based upon Momence's actions during her employment, including its actions in terminating Mitchell. Absher's claims are clearly based upon Momence's employment-related practices and are excluded from coverage under the terms of the policy.

Defendants have also argued that the claims of mental and emotional suffering made by Absher and Mitchell are covered by the professional liability coverage provided in the policy, which does not include an employment-related practices exclusion. Defendants rely on <u>Dixon Distrib. Co. v. Hanover Ins. Co.</u>, 641 N.E.2d 395 (Ill. 1994) in support of this argument. In <u>Dixon</u>, the Illinois Supreme Court found coverage for a retaliatory discharge claim under a policy providing coverage for "Personal Injury Liability, . . . arising out of an occurrence." <u>Dixon</u>, 641 N.E.2d at 398. The court in <u>Dixon</u> noted that, with respect to personal injury, the policy at issue defined "occurrence" as "an offense which results in Personal Injury, other than an offense committed with actual malice or the willful violation of a penal statute or ordinance committed by or with knowledge or consent of the insured." <u>Dixon</u>, 641 N.E.2d at 398. The court then concluded that the policy provided coverage because "actual malice" was not an element of retaliatory discharge. <u>Dixon</u>, 641 N.E.2d

at 398-400.

This court concludes that the coverage provided by the HealthCap policy is much different. As Defendants have recognized, the professional liability insurance policy provides coverage for injury caused by a "medical incident."  The policy clearly and unambiguously defines a "medical incident" as "an act or omission in the furnishing of professional services by an insured."  This court agrees with HealthCap that the relators' claims of retaliation and mental distress relate directly to their employment relationship with Momence, not to a "medical incident" as defined in the policy. This court therefore concludes that the relators' allegations of retaliation do not fall within, or even potentially within, this coverage.

For all of the reasons stated, this court concludes that HealthCap does not have a duty to defend Counts III and IV of the underlying Third Amended Complaint.

## VII.  DUTY TO INDEMNIFY

Defendants are correct that the law is clear that a the "question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it."  Travelers Ins. Co. v. Eljer Mfg., 757 N.E.2d 481, 491-92 (Ill. 2001), quoting Outboard Marine Corp., 607 N.E.2d at 1221; see also Premcor USA, Inc. v. Am. Home Assurance Co., 400 F.3d 523, 530 (7th Cir. 2005).  Therefore, this court cannot grant summary judgment to HealthCap on the issue of the duty to indemnify.

 IT IS THEREFORE ORDERED THAT:

(1) HealthCap's Motion for Summary Judgment (#34) is GRANTED in part and DENIED in part.  For the reasons stated, this court concludes that HealthCap does not have a duty to defend Defendants in the underlying action.  Therefore, judgment is entered in HealthCap's favor on its

24

Declaratory Judgment action as far as the duty to defend.

(2) This court has made its determination as to the duty to defend in this case. However, Defendants are correct that the issue of indemnification cannot be determined until after the underlying action has become final and any liability is determined. This court therefore dismisses this action, without prejudice, with leave to reinstate after the underlying proceedings have become final and any liability has been determined.

(3) Defendants' request for oral argument, included in their Response, is DENIED as moot.

(4) This case is terminated.

ENTERED this 22nd day of February, 2008.

s/DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE